

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| PAULA HILL, *individually and as personal representative of the Estate of Frank Hill*,<br>　　　　Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA, ASSOCIATES ROOFING & CONSTRUCTION, INC., THE EARTHWORKS GROUP, INC., and JOHN JOE 1–3,<br>　　　　Defendants.<br>───────────────────────<br>ASSOCIATES ROOFING & CONSTRUCTION, INC.,<br>　　　　Third-Party Plaintiff,<br><br>vs.<br><br>THE LANE CONSTRUCTION CORPORATION *d/b/a/ Rea Contracting*<br>　　　　Third-Party Defendant. | Civil Action No.: 3:19-00958-MGL |

**MEMORANDUM OPINION AND ORDER
GRANTING DEFENDANT USA'S MOTION TO DISMISS**

### I.     INTRODUCTION

Plaintiff Paula Hill (Mrs. Hill), individually and as personal representative of her late husband Dr. Frank Hill (Dr. Hill), brings this wrongful death and survival action against the United States of America (USA), Associates Roofing & Construction, Inc. (ARC), The Earthworks

Group, Inc. (Earthworks), and John Joe 1–3 for damages under the Federal Tort Claims Act (FTCA) and South Carolina law.

Pending before the Court is the USA's motion to dismiss for lack of subject matter jurisdiction. Having carefully considered the USA's motion, Mrs. Hill's response, the USA's reply, Mrs. Hill's sur reply, the USA's response to Mrs. Hill's sur reply, the record, and the applicable law, it is the judgment of the Court the USA's motion will be granted.

**II.     FACTUAL AND PROCEDURAL HISTORY**

On July 23, 2016, Dr. Hill was involved in a fatal bicycle accident on the shoulder of Hampton Parkway at Fort Jackson in Columbia, South Carolina (the Fort).

According to Mrs. Hill, during an early morning ride at the Fort, the front wheel of her husband's bicycle became lodged between the parallel steel bars of a drainage grate located on Hampton Parkway. The alleged impact of Dr. Hill's front tire connecting with, and becoming stuck between, the parallel steel bars of the drainage grate forced the rear tire of his bicycle into the air and threw his body onto the pavement. The impact of Dr. Hill's body hitting the pavement, Mrs. Hill contends, resulted in his death. The drainage grate at issue consisted of equally spaced parallel steel bars running with the flow of the underground stormwater and the road.

Several years before the accident, the Fort hired ARC to resurface certain roads on the Fort. As is relevant here, the Fort issued a work order for ARC to resurface Hampton Parkway. ARC hired Earthworks to perform the design and engineering work for the Hampton Parkway resurfacing, and Lane Construction Corporation, d/b/a Rea Contracting (Lane), to supply the labor and materials. Although the Hampton Parkway resurfacing scope of work referenced adjustments to catch basin lids as they relate to maintaining positive slope after the laying of asphalt, it did not

call for the replacement of, or modification, any drainage grate that consisted of steel bars running with the flow of traffic.

Mrs. Hill filed a wrongful death and survival action against the USA and John Joe 1–3. Mrs. Hill later added ARC and Earthworks as defendants; and ARC, as a third-party plaintiff, initiated a cause of action against Lane. The USA subsequently filed its motion to dismiss, Mrs. Hill responded, the USA replied, and Mrs. Hill filed a sur reply to which the USA responded. The Court, having been fully briefed on the relevant issues, will now adjudicate the USA's motion.

### III.     STANDARD OF REVIEW

"The plaintiff has the burden of proving that subject matter jurisdiction exists." *Evans v. B.F. Perkins Co., a Div. of Standex Intern. Corp.*, 166 F.3d 642, 647 (4th Cir. 1999). "When a defendant challenges subject matter jurisdiction pursuant to Rule 12(b)(1), 'the district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.'" *Id.* (quoting *Richmond, Fredericksburg & Potmac R. Co. v. United States*, 945 F.2d 765, 769 (4th Cir. 1991)). "The moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Richmond, Fredericksburg & Potomac R. Co.*, 945 F.2d at 768.

"The United States, as sovereign, is immune from suit save as it consents to be sued[.]" *United States v. Sherwood*, 312 U.S. 584, 586 (1941). The United States Supreme Court "has long decided that limitations and conditions upon which the [g]overnment consents to be sued must be strictly observed and exceptions thereto are not to be implied." *Soriano v. United States*, 352 U.S. 270, 276 (1957). If the Court finds the United States is immune from suit, it must dismiss the

3

complaint for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), as opposed to granting summary judgment under Rule 56. *See Williams v. United States*, 50 F.3d 299, 305 (4th Cir. 1995) ("We observe rather than granting summary judgment pursuant to Rule 56(c), the district court should have dismissed the [FTCA] suit for want of jurisdiction under Rule 12(b)(1) if the United States is not liable for [plaintiff's] injury.").

"The plaintiff bears the burden of persuasion if subject matter jurisdiction is challenged under Rule 12(b)(1) because the party who sues the United States bears the burden of pointing to . . . an unequivocal waiver of immunity." *Id.* at 304 (internal quotations omitted).

## IV.     DISCUSSION AND ANALYSIS

The USA presents two arguments in support of its contention the Court must dismiss this matter for lack of subject matter jurisdiction. As to the first, the USA argues it is immune from Mrs. Hill's suit under the FTCA's discretionary-function exception.

Mrs. Hill, on the other hand, contends the USA's motion should be denied because the discretionary-function exception to the FTCA fails to apply to the factual situation before the Court, as the simple marking, maintenance, and repair of the drainage grate at issue was mandated by federal policy and not a matter involving policy considerations.

Before the Court considers the parties' arguments, it will provide a brief primer on the FTCA. The FTCA "waives the sovereign immunity of the United States with respect to civil actions in federal court for injuries 'caused by the negligent or wrongful act or omission of any employee of the [g]overnment while acting within the scope of his office or employment.'" *Holbrook v. United States*, 673 F.3d 341, 345 (4th Cir. 2012) (quoting 28 U.S.C. § 1346(b)). When

immunity is waived, "the government may be held liable in tort 'in the same manner and to the same extent as a private individual under like circumstances.'" *Id.* (quoting *id.* § 2674).

"The liability of the United States under the FTCA is limited by the discretionary[-] function exception." *Williams*, 50 F.3d at 308. The discretionary-function exception, as is relevant here, provides the United States is not liable for:

> [a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the [g]overnment, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). "The discretionary[-]function exception 'marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals.'" *Suter v. United States*, 441 F.3d 306, 310 (4th Cir. 2006) (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984)).

Congress enacted this exception "to prevent judicial second guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Varig Airlines*, 467 U.S. at 814 (internal quotation omitted). "By fashioning an exception for discretionary governmental functions, including regulatory activities, Congress took 'steps to protect the [g]overnment from liability that would seriously handicap efficient government operations.'" *Id.* (quoting *United States v. Muniz*, 374 U.S. 150, 163 (1963)).

Determining whether the discretionary-function exception precludes a claim against the United States is a two-step process. As to the first step, the Court must determine whether the act or omission at issue "involves an element of judgment or choice." *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536 (1988). An action is considered a judgment or choice unless a "'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,'

5

because the 'employee has no rightful option but to adhere to the directive.'" *United States v. Gaubert*, 499 U.S. 315, 322 (1991) (quoting *Berkovitz*, 486 U.S. at 536). Accordingly, under this first step of the discretionary-function exception analysis, "[t]he inquiry boils down to whether the government conduct is the subject of any mandatory federal statute, regulation, or policy proscribing a specific course of action." *Baum v. United States*, 986 F.2d 716, 720 (4th Cir. 1993).

Thus, if the Court concludes the government's conduct was discretionary and not the subject of "any mandatory federal statute, regulation, or policy proscribing a specific course of action[,] *Id.*, the Court must proceed to the second step of the analysis. Under this step, the Court "ask[s] whether the choice or judgment involved is one 'based on considerations of public policy.'" *Id.* (quoting *Berkovitz*, 486 U.S. at 531). If the Court concludes the discretionary conduct was based on considerations of public policy, the claim is precluded against the government.

The court in *Baum* observed, with respect to the second prong of the discretionary-function exception analysis,

> Rather than requiring a fact-based inquiry into the circumstances surrounding the government actor's exercise of a particular discretionary function, we are the opinion that a reviewing court in the usual case is to look to the nature of the challenged decision in an objective, or general sense, and ask whether that decision is one which we would expect inherently to be grounded in considerations of policy.

*Id.* at 720–21.

And, "consistent with the objective approach to evaluation of whether a particular discretionary act is grounded in policy considerations is the well-established presumption that public officials have properly discharged their official duties." *Id.* at 721. As such, under the presumption public officials have properly discharged their official duties, a "court will not assume that government agents, in undertaking actions of the type normally thought to involve policy

6

choices, in a particular case acted arbitrarily or on whim [and] disregard[ed] those essential policy questions." *Id.*

The Court will now address the parties' arguments as to whether each prong of the FTCA's discretionary-function exception is met. If both prongs are met, the discretionary-function exception applies and the Court, absent an exception to the FTCA, will grant the USA's motion to dismiss.

> **A.    Whether a federal statute, regulation, or policy required the Fort to modify the parallel steel bar drainage grate and ensure its bars run perpendicular to traffic and be flush with the road (Prong One)**

The USA asserts "there is no federal statute, regulation, or policy specifically mandating the parameters of a proper road-side storm water drainage system[,]" USA's Mot. to Dismiss at 22, and any decision by the Fort as to the drainage system "involves an element of judgment or choice." *Berkovitz*, 486 U.S. at 536.

Mrs. Hill insists, to the contrary, numerous mandatory federal regulations and policies required the Fort to undertake certain actions that would have prevented Dr. Hill's bicycle accident. In particular, Mrs. Hill claims several government studies commissioned by the Fort, Department of Defense Directives (DoDD) and Instructions (DoDI), and a 1977 Federal Highway Administration (FHWA) study all acted as regulations and/or policies "specifically prescrib[ing] a course of action for [Fort employees] to follow[,]"*Gaubert*, 499 U.S. at 322 (quoting *Berkovitz*, 486 U.S. at 536), as to the drainage grate at issue. The Court will address each of these three alleged regulations and/or policies in turn.

7

> 1. *Whether the governmental studies commissioned by the Fort acted as regulations or policies directing it to modify the parallel steel drainage grate at issue and ensure it be flush with the road*

As to the governmental studies commissioned by the Fort, Mrs. Hill cites two: a 2011 and a 2015 Military Surface Deployment and Distribution Command Transportation Engineering Agency (SDDCTEA) study.

> a. *2011 SDDCTEA Study*

Prior to addressing the parties' arguments regarding the 2011 SDDCTEA study (2011 study), the Court will provide a brief overview of its purpose and goal. SDDCTEA, in or around 2011, at the request of the Fort, "conducted a comprehensive transportation study at the [Fort]." 2011 Study at 1.1. The purpose of the 2011 study "was to assess existing [infrastructure] conditions [at the Fort] and to identify short term and long-term transportation needs to safely provide for existing and future transportation demands." *Id.* The 2011 study focused its analysis primarily on "intersections, roadway corridors, parking areas, pedestrian accommodations, and access control points (ACPs)[,]" *id.*, and stated its goal was "to provide recommendations to improve traffic flow and safety and to assist in future [transportation] planning." *Id.* Also, the 2011 study noted its focus centered on "maximizing costs verses anticipated security, safety, and traffic benefits." *Id.* at 1.2.

Returning to the parties' arguments, the USA notes the 2011 study was commissioned by the Fort and posits it provided recommendations, not mandates, for the Fort to implement at its discretion. In support of this position, the USA contends "[t]here was no mandate for the [Fort] to undertake the recommendations in these studies, nor do these studies address the grate [Mrs. Hill] contends caused Dr. Hill's accident." USA's Reply at 11.

Mrs. Hill avows the 2011 study "was developed and issued under policy directives and regulations that *mandate its implementation* [by the Fort]" and it "called for immediate and near-term [transportation-related] improvements of various types on Hampton Parkway, which encompassed the drainage grate issue presented [in this case]." Mrs. Hill's Resp. at 6.

Here, the Court agrees with the USA's contention the 2011 study failed to act as a federal statute, regulation, or policy "specifically prescrib[ing] a course of action[,]" *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz*, 486 U.S. at 536), regarding the Fort's design decisions of the storm water drainage system, including the drainage grate at issue.  The 2011 study failed to mention or discuss the need to ensure drainage grates were installed so the parallel steel bars run against the flow of traffic.  In fact, the 2011 study neglects to mention or discuss the specific drainage grate at issue in this case.

Notwithstanding the fact the 2011 study neglected to discuss the drainage grate at issue in this case, or the need to ensure drainage grate steel bars run against the flow of traffic, the recommendations made in the study use non-mandatory, discretionary language such as "Remove the jersey barriers, if possible"; "Preferably, install guardrail to shield the culvert"; "If pedestrian safety is a concern at this location . . ." 2011 Study at 5.30, 31, 33.

The non-mandatory, discretionary language of this study "involves an element of judgment or choice." *Berkovitz*, 486 U.S. at 536.  Mrs. Hill fails to present a single case demonstrating SDDCTEA studies constitute a "federal statute, regulation, or policy" in the context of the FTCA's discretionary-function exception. *Gaubert*, 499 U.S. at 322.  At bottom, the 2011 study failed to eliminate the Fort's discretion in choosing which transportation related infrastructure recommendations to implement and the manner in which to do so.

### b.     *2015 SDDCTEA Study*

Before addressing the parties' arguments regarding the 2015 SDDCTEA study (2015 study), the Court will provide a brief overview of its purpose and goal as well.  The 2015 study served as "a follow-up to the [2011 study], and is more focused on corridor and traffic flow and traffic signal operation."  2015 Study at 1.1.  The purpose of the 2015 study, similar to the 2011 study, was "to assess existing conditions [at the Fort] and to identify short term and long-term transportation needs to safely provide for existing and future transportation demands, although [the] study [was] limited to the major traffic flow corridors on base."  *Id.*  This study recommended, among other things, "roadways should be flush with the pavement[.]"  2015 Study at 6.8.

The USA maintains the 2015 study "intended to provide guidance to Fort Jackson's leadership in identifying needs and establishing [transportation related project] priorities" and it failed to "remove or eliminate the [Fort]'s discretion to choose which projects to implement and how to perform them."  USA's Reply at 11 (footnote omitted).

Mrs. Hill, similar to her argument as to the 2011 study, avers the 2015 study mandated implementation to rectify hazardous road deficiencies on Hampton Parkway, such as "hazardous drainage inlets not flush with pavement that posed a specific hazard to two wheeled vehicles."  Mrs. Hill's Resp. at 6 (internal citation omitted).

Here, the Court's analysis of the 2015 study is identical to its analysis regarding the 2011 study as discussed above.  The 2015 study failed to act as a federal statute, regulation, or policy "specifically prescrib[ing] a course of action[,]" *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz*, 486 U.S. at 536), regarding the Fort's design decisions as to the storm water drainage system, including the drainage grate at issue.  And, similar to the 2011 study, the recommendations in the 2015 study use non-mandatory language.  For example, as to recommendations regarding the flushness of

grates to the pavement, the 2015 study notes its suggestions are "preferred" as opposed to mandatory. 2015 Study at 6.1.

Consequently, for these reasons, the Court concludes the 2011 and 2015 studies fail to act as regulations or policies directing the Fort to modify the parallel steel drainage grate at issue and ensure it be flush with the road.

### 2. *Whether the DoDD and DoDI acted as policies or regulations directing the Fort to modify the parallel steel drainage grate at issue and ensure it be flush with the road*

The USA insists "[w]hile these regulations list [g]overnment obligations regarding vehicle safety in a macro-sense, implementing those general principles involve[] judgment and discretionary decisions." USA's Reply at 13. In particular, the USA contends the language used in the DoDD and DoDI such as "maintain, modernize, identify, and review necessarily implicate a process imbued with innumerable decisions based on judgment." *Id.* (footnote omitted) (punctuation modified).

Mrs. Hill, on the other hand, maintains the DoDD and DoDI governed the Fort "in material respects" and its failure to abide by them "resulted in this tragedy." Mrs. Hill's Resp. at 22. In particular, Mrs. Hill repeatedly cites to the word "safe" or "safety" as they repeatedly appear in the DoDD and DoDI. *Id.*

Here, similar to the discussion of the 2011 and 2015 studies above, the DoDD and DoDI fail to act as a federal statute, regulation, or policy "specifically prescrib[ing] a course of action[,]" *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz*, 486 U.S. at 536), regarding the Fort's design decisions as to the storm water drainage system, including the drainage grate at issue. In the DoDD and DoDI, no mandatory directive exists that requires the Fort to survey its property and immediately modify any and all drainage grates to ensure their parallel steel bars run perpendicular

to traffic. Likewise, no mandatory directive exists in the DoDD and DoDI that requires the Fort to survey its property and immediately make flush all drainage grates to the pavement.

A Fourth Circuit case, *Baum v. United States*, 986 F.2d 716 (4th Cir. 1993), lends credence to this conclusion. In *Baum*, two plaintiffs were injured in an automobile accident when their vehicle drove through a guardrail on a bridge over the Baltimore-Washington Parkway, falling onto the roadway below. *Id.* at 718. The bridge and the guardrail were owned and maintained by the United States Department of Interior, National Park Service. *Id.* The plaintiffs sued the USA pursuant to the FTCA, alleging negligent design, construction, and maintenance of the guardrail they drove through. *Id.*

Plaintiffs, in an attempt to show a statute, regulation, or policy required the guardrails be constructed with safer and better quality materials, cited to the legislation authorizing the construction of the bridge and argued it acted as a Congressional mandate. *Id.* at 721. The legislation authorizing the construction of the bridge, as is relevant here, stated "The [Baltimore-Washington] parkway shall be constructed, developed, operated, and administered as a limited access road primarily to provide a protected, safe, and suitable approach for passenger-vehicle traffic . . . ." *Id.* (quoting Pub. L. No. 81-643, § 2, 64 Stat. 400, 401 (1950)).

The *Baum* court recognized "very general, sweeping language [as found in the legislation] is insufficient to remove questions of design and construction of the guardrails on the parkway from the discretion of the National Park Service" and plaintiffs "simply read too much into this language when they argue that the direction" in the legislation that requires a safe and suitable approach for traffic "constitutes a mandatory statute, regulation, or policy within the meaning of *Gaubert* and *Berkovitz*." *Id.* at 722. Thus, according to the court in *Baum*, the language in the

legislation "cannot be interpreted as removing all safety-related decisions from the discretion of the agency administering the project." *Id.* (footnote omitted).

And, in a footnote, the *Baum* court also rejected plaintiff's citation to a "work known as the Standard Specifications for Highway Bridges . . . they represent was adopted by the American Association of State Highway Officials" because the language cited, even considering it was adopted by the United States, "is far too general to serve as a mandatory regulation governing the choice of guardrail post materials under the *Berkovitz-Gaubert* analysis." *Id.* at fn 2.

Mrs. Hill "simply reads too much into" the safety language in the DoDD and DoDI as "constitut[ing] a mandatory statute, regulation, or policy within the meaning of *Gaubert* and *Berkovitz*." *Id.* at 722. "Surely such language cannot be interpreted as removing all safety-related decisions from the discretion of the agency administering the project." *Id.* (footnote omitted).

Accordingly, the Court concludes the DoDD and DoDI fail to act as regulations or policies directing the Fort to modify the parallel steel drainage grate at issue and ensure it be flush with the road.

> ### 3. Whether the 1977 FHWA study acted as a regulation or policy directing the Fort to modify the parallel steel drainage grate at issue and ensure it be flush with the road

The FHWA, in 1977, issued a Bicycle-Safe Grate Inlets Study (Bike study). A "major objective of the investigation [underlying the Bike study] was to identify grate inlets [that were] bicycle and pedestrian safe, hydraulically efficient, and demonstrate good debris-handling characteristics." Grate Study at 6.1. The Grate study noted although "the parallel bar grate has been recognized as a very efficient grate inlet . . . , [it] is not safe for bicycle traffic." *Id.* And, the study provided recommendations, not mandates. *See* Chapter 14, Summary and Recommendations, Bike Study at 14.1.

The USA argues the Bike study is simply a "study and a guide" and neglects to "mandate action by the [g]overnment." USA's Reply at 12. Mrs. Hill, however, avers the Bike study acted as a mandate requiring the Fort to rectify such an unsafe condition.

Here, Mrs. Hill again mistakes and misstates another governmental study consisting of recommendations as "specifically prescrib[ing] a course of action[,]" *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz*, 486 U.S. at 536), regarding the Fort's design decisions as to the storm water drainage system, including the drainage grate at issue. For the same reasons listed above regarding the 2011 and 2015 studies, the Court concludes the Bike study fails to act as a regulation or policy directing the Fort to modify the parallel steel drainage grate at issue.

Accordingly, the Court concludes the USA meets the first prong of the discretionary-function exception test because no "federal statute, regulation, or policy[,]" *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz*, 486 U.S. at 536), prescribed the Fort to change the parallel steel drainage grate at issue and ensure it be flush with the road.

> **B.     Whether decisions regarding when and how to modify the storm drainage system, including the drainage grate at issue, are susceptible to policy analysis (Prong Two)**

The USA maintains "a federal agency's decisions regarding whether, when, and how to repair or modify its infrastructure are grounded in policy considerations, including safety, the environment, resource allocation, and cost." USA' Mot. to Dismiss at 22–23 (footnote omitted).

Mrs. Hill argues, on the other hand, the underlying issue in this case is a simple road maintenance task that is not susceptible to policy analysis.

The USA, in response to that argument, avers "the use of a parallel barred grate in an interconnected stormwater drainage system is not" a maintenance task as characterized by Mrs. Hill. USA's Reply at 19. In support of that contention, the USA notes "the grate in question was

14

not cracked or damaged" and Mrs. Hill merely "objects to the choice and use of the parallel grate as a matter of negligent design, not maintenance." *Id.*

Here, as to the public policy analysis element of the discretionary-function exception, "[t]here is a 'strong presumption' that the second part of th[e] *Gaubert* test is satisfied if a court concludes that the employee was exercising discretion[,]" *A.O. Smith Corp. v. United States*, 774 F.3d 359, 365 (6th Cir. 2014) (quoting *Gaubert*, 499 U.S. at 324), which the Court concludes here. The decision of the Fort on how to maintain its stormwater drainage system, including but not limited to the drainage grates, is one of discretion and the type of judgment the discretionary[-] function exception "was designed to shield." *Varig Airlines*, 467 U.S. at 813. Consequently, the Court concludes the second prong of the discretionary-function exception is met.

Thus, the Court concludes both prongs of the discretionary-function exception are met and the USA is entitled to sovereign immunity, absent an exception to the FTCA, as to Mrs. Hill's claims.

Turning to the USA's second argument, it posits it is unable to be sued "under the FTCA for a tort committed by an independent contractor." USA's Mot. to Dismiss at 31 (emphasis and capitalization modified).

Mrs. Hill avers the USA's negligent selection of ARC and its alleged extensive day-to-day supervision and control over the ARC Hampton Parkway contract preclude it from availing itself of the independent contractor exception. In particular, Mrs. Hill argues, among other things, the contract provided by the USA was extremely detailed as the projects' s specifications, and the contract called for quality insurance inspections by the USA.

The USA, in its reply, avers "no actionable duty arises in favor of an injured person from the government's alleged inspection, enforcement, or supervision of a contract" and "such

15

activities do not constitute sufficient control over the contractor to vitiate the [independent] contractor exclusion." USA's Reply at 28–29.

"The FTCA, as a waiver of sovereign immunity, is strictly construed, and all ambiguities are resolved in favor of the sovereign." *Robb v. United States*, 80 F.3d 884, 887 (4th Cir. 1996). A plaintiff is unable to sue the USA under the FTCA for a tort committed by an independent contractor. *See id.* ("[T]he independent contractor exception to the waiver of sovereign immunity has been construed broadly."). "When the challenged conduct in a FTCA action was performed by an independent contractor, the district court must dismiss the action for want of subject matter jurisdiction." *Id.* at 887 fn 2.

But, when the USA maintains "such day-to-day control over the affairs of" a contractor and the Court determines the contractor "was primarily acting as an instrumentality or agency of the United States or on behalf of a federal agency in [its] official capacity," a plaintiff may bypass the independent contractor exception. *Berkman v. United States*, 957 F.2d 108, 113 (4th Cir. 1992) (internal citation omitted) (alterations omitted). As the Fourth Circuit has noted, the "real test [for a Court to use when determining whether a contractor is an employee or an independent contractor] is control over the primary activity contracted for and not the peripheral, administrative acts relating to such activity." *Wood v. Standard Products Co.*, 671 F.2d 825, 832 (4th Cir. 1982).

Here, the record demonstrates the USA did not have the right to control ARC's day-to-day performance of their work in resurfacing Hampton Parkway. "The fact of broad, supervisory control, or even the potential to exercise detailed control, cannot convert a contractor into an agent, nor can it be the basis for imposing vicarious liability on the United States." *Gibson v. United States*, 567 F.2d 1237, 1242 (3d Cir. 1977). Consequently, the Court concludes the independent contractor exception applies in this case.

Because the Court concludes both prongs of the discretionary-function exception are met, as well as the independent contractor exception to the FTCA applies, the Court will grant the USA's motion to dismiss. And, because this issue is dispositive, the Court need not address the parties' other arguments.

## V.     CONCLUSION

For the reasons stated above, it is the judgment of the Court the USA's motion to dismiss will be **GRANTED.**

 **IT IS SO ORDERED.**

Signed this 31st day of March 2021, in Columbia, South Carolina.

s/ Mary Geiger Lewis
MARY GEIGER LEWIS
UNITED STATES DISTRICT JUDGE
